# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

HENRY JOSEPH VAZQUEZ,

Petitioner,

v.

M. ELIOT SPEARMAN, Warden,

Respondent.

Case No.: 18-CV-2900 JLS (MSB)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**

Presently before the Court is a Petition for a Writ of Habeas Corpus filed by Henry Joseph Vazquez pursuant to 28 U.S.C. § 2254 (ECF No. 1), to which Respondent has filed an Answer (ECF No. 9).  For the following reasons, the Court **DENIES** the Petition and **DECLINES** to issue a Certificate of Appealability.[1]

## BACKGROUND

Petitioner, a California prisoner proceeding pro se, challenges his San Diego County Superior Court convictions for first degree burglary and vandalism, for which he was sentenced to 41 years-to-life in state prison, enhanced as a result of three prior felony burglary convictions.  (ECF No. 1 at 1.)  He claims his federal constitutional rights were

---

[1] Although this case was referred to United States Magistrate Judge Michael S. Berg pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for the disposition of this matter.  *See* S.D. Cal. Civ.L.R. 71.1(d).

violated by: the introduction of details of his prior convictions (claim one), cross-examination of a defense expert regarding opinions the expert testified to in seven unrelated cases (claim two), ambiguous or contradictory jury instructions regarding the intent element of burglary (claim three), prosecutorial misconduct in closing argument by mischaracterizing the law and arguing facts not in evidence, as well as ineffective assistance of counsel by defense counsel's failure to object (claim four), and by the cumulative effect of those errors (claim five).  (*Id*. at 5-10, 24–39.)

Respondent answers that habeas relief is unavailable because: (1) the prosecutorial misconduct aspect of claim three is procedurally defaulted as a result of defense counsel's failure to object, (2) the majority of the claims allege errors of state law only and are not cognizable on federal habeas, and (3) to the extent there are federal claims, the state court adjudication is neither contrary to, nor an unreasonable application of, clearly established federal law.  (ECF No. 9 at 2–5.)  Petitioner has not filed a Traverse.

# I.    **State Court Proceedings**

Petitioner was charged with one count of first degree burglary in violation of California Penal Code §§ 459 & 460(a) (count one); one count of making a criminal threat in violation of California Penal Code § 422 (count two); and one count of vandalism over $400 in violation of California Penal Code § 594(a)(b)(1) (count three).  (Clerk's Tr. ["CT"] at 13-14 [ECF No. 10-1].)  It was alleged he had two prior convictions for first degree burglary which constituted serious felonies and "strikes" within the meaning of California Penal Code §§ 667(b)-(i), 668, 1170.12 & 1192.7(c), as well as prior felony convictions for burglary and for providing false identification to a police officer which constituted "prison priors" within the meaning of California Penal Code §§ 667.5(b) & 668.  (*Id*. at 15–18.)

A jury found Petitioner guilty on counts one and three but were unable to reach a verdict on count two, which was dismissed.  (CT at 227.)  He admitted the truth of his prior conviction allegations and was sentenced on count one to 25 years-to-life as a result of the two prior strikes, with consecutive five-year terms each for the two prior serious felonies,

plus a consecutive one-year term for a prison prior; on count two, he received a consecutive four-year term with a consecutive one-year term for a prison prior; the total sentence for the two claims was 41 years-to-life in state prison.  (Reporter's Tr. ["RT"], vol. 9 at 821–22.)

Petitioner appealed, raising the claims presented here.  (Lodgment Nos. 12-14.)  The appellate court affirmed.  (Lodgment No. 15, *People v. Vasquez*, No. D070638, slip op. (Cal.App.Ct. July 19, 2017)).)  He presented the same claims to the state supreme court in a petition for review, which was summarily denied.  (Lodgment Nos. 16-17.)

## II.     Evidence Presented at Trial

Kim Schildmeyer testified that on August 9, 2015, she was staying at the Holiday Lodge motel in San Ysidro, California, with her daughter, her son-in-law, her 78-year-old mother, and her five-year-old grandson.  (RT at 390–91.)  At about midnight, she heard three or four loud bangs on her door, as if it were being kicked.  (*Id.* at 391-92.)  She looked through the peephole and did not see anyone; she then opened the door a crack and heard two men's voices coming from above but did not see anyone and went back to bed.  (*Id.* at 392.)  About ten or fifteen minutes later, there was another banging on the door, and Kim and her daughter looked though the peephole and saw a man they had never seen before, who Kim identified in court as Petitioner.  (*Id.* at 393, 397.)  She described him as big, bald, shirtless and covered in tattoos who was "very angry, very - shaking and just very aggressive, that was going to do us harm."  (*Id.* at 397.)  She cracked the door open a few inches and Petitioner, "kind of upset, hysterical acting," said: "Give me the cell phone.  I need a cell phone.  Give me a cell phone."  (*Id.* at 394.)  She told him: "I didn't have one. It didn't work," and to go to the manager's office and they would make a call for him.  (*Id*.) Petitioner insisted, repeatedly saying: "No, give me your phone.  Give me your phone.  I need to call 911."  (*Id.* at 395.)  Kim repeated she did not have a phone, pointed to the office across the parking lot and told him to go there, but said Petitioner "really wasn't listening."  (*Id.* at 395–96.)  Petitioner put his foot in the crack of the door and grabbed it with both hands, which prevented it from closing despite Kim and her daughter both trying

to push it closed.  (*Id.* at 396.)  He then kicked the door once or twice and said: "Give me the phone -- or open the door or someone is going to get hurt.  Someone is going to get killed.  Open the door."  (*Id.* at 396.)  Kim and her daughter were eventually able to close the door, which locked automatically.  (*Id.* at 398.)  They peeked out the window next to the door, saw he was gone, called the motel manager and told him to call the police, and called 911 themselves.  (*Id.* at 398.)

While waiting for the police to arrive, Kim went outside and saw Miguel, the motel manager, walking toward her.  (*Id.* at 399.)  Someone on the balcony above her told Miguel the man was running up the driveway; Miguel looked, but no one was there.  (*Id.* at 403.) Kim was acquainted with the people who lived above her and stepped out into the parking lot to thank them, but saw Petitioner sitting in a chair on the balcony.  (*Id.*)  It was Petitioner who had told Miguel "there he goes," and Kim said Petitioner had "a half grin, like, a sneer kind of like.  It wasn't a happy smile.  It was, like, a look like, ha, like he fooled Miguel into going the opposite direction."  (*Id.*)  Kim pointed to Petitioner, told Miguel he was the man, and ran back into her room and shut the door.  (*Id.*)

Kim looked out the peephole and saw Miguel walking toward her room carrying a baseball bat; she stepped outside and pointed out Petitioner, who was now in the parking lot.  (*Id.* at 400–01.)  Petitioner said: "It's not me.  It's that other guy.  It wasn't me."  (*Id.* at 401.)  Kim replied: "Yes, it's you," and Miguel turned around and told Petitioner the police were on their way and to get off the motel property.  (*Id.*)  Petitioner was very upset and yelled at Kim he was not the person who tried to get into her room.  (*Id.*)  She watched as Miguel and Petitioner walked to the boundary of the property and out of sight, and said she was worried about Miguel because he is much smaller than Petitioner, who is listed in his probation report as 6'-2" tall and 200 pounds.  (*Id.* at 401–02; CT at 176.)  Petitioner came walking back down the driveway toward her room without Miguel, and Petitioner ran at Kim when he saw her.  (RT at 404–05.)

Kim said she "just knew" Petitioner was coming to hurt her and her family, ran back into the room, locked the door, and had the entire family hide in the bathroom.  (*Id.* at 406.)

4

Her grandmother was suffering from dementia and her son-in-law was recovering from open heart surgery. (*Id.*) After a few minutes of quiet, Kim and her daughter went back into the bedroom, heard a loud cracking sound outside, looked though the peephole and saw Petitioner tearing a picket from a picket fence in front of their room. (*Id.* at 407.) Her daughter peeked out the window and screamed for them to get back into the bathroom. (*Id.*) The window shattered just as they shut the bathroom door. (*Id.*) They heard glass crunching as Petitioner walked across the room and began beating on the bathroom door. (*Id.* at 408.) It took all their strength to hold the bathroom door shut, and Petitioner eventually kicked a hole in the bottom of the door. (*Id.*)

Kim said Petitioner was "mumbling and grumbling. He was, like, open the door or I'm going to kill you. You're dead. Somebody is going to die. I can't quote exactly the words. But that - I don't know if he said somebody is going to die or you're all going to die. Open the door. It was we were going to die." (*Id.*) Petitioner reached in through the hole near their legs holding a cell phone which had been on the table between the beds, which could not make calls and was used for games. (*Id.* at 408–09, 416, 442.) Kim kicked the phone out of his hand; he picked it up and pulled it out of the bathroom, then reached back in and tried to grab her daughter's leg. (*Id.* at 444–45.) He then kicked a larger hole and reached up and unlocked the door. (RT 409, 444.) The door opened a few inches and Petitioner put one hand on the doorjamb trying to open it; Kim and her daughter pushed back and were able to shut the door. (*Id.*) Kim told her daughter to relock the door, but when she stopped pushing in order to work the lock Petitioner was able to push it open a couple of inches and place his hand on the doorjamb. (*Id.*) Kim's son-in-law then used a metal shower rod to beat Petitioner's hand until it was withdrawn. (*Id.* at 409–10.) Kim called 911 three times that night; a ten-minute recording of her third call from inside the bathroom was played for the jury (*Id.* at 413), and a transcript is in the record. (CT at 46–52.) She said it seemed to take a long time but, eventually, the 911 operator told her she could come out because Petitioner was in custody. (RT at 411.)

///

Shannon Tabor testified that she was in room 118 at the Holiday Lodge motel at midnight on August 9, 2015, along with her mother Kim Schildmeyer and other family members. (*Id.* at 453–54.) She described the same events as Kim and identified Petitioner in court as the man who "traumatized" them that night. (*Id.* at 454–85.) When Petitioner first came to the front door he said: "I need your phone. I need your phone. Somebody is going to die," and told them he wanted to call 911. (*Id.* at 463–64.) Shannon said she could not remember what Petitioner said at the bathroom door, saying: "It was more like a growling-type sound. I don't remember the words." (*Id.* at 460.) Shannon called Miguel but did not tell him Petitioner had threatened to kill them. (*Id.* at 465–66.) Although Shannon thought she had told the police that night that Petitioner had threatened them, there was no mention of such threats in her police statement. (*Id.* at 485.)

Miguel Hernandez testified he was working at the Holiday Lodge motel about midnight on August 9, 2015, when he received a call from Kim in room 118. (*Id.* at 487–89.) Kim said a man was trying to get into her room, so he grabbed a baseball bat and went outside to help her. (*Id.* at 489.) As he approached room 118, he saw a man on the balcony directly above who was not a motel guest, who he identified in court as Petitioner. (*Id.* at 490–92.) Miguel asked Petitioner if he was a motel guest and Petitioner told him his true name but did not ask him to call 911. (*Id.* at 511.) Miguel went back into the office and, when he came out, he saw Petitioner bothering Kim and another woman. (*Id.* at 492–94.) He told Petitioner to leave and that the police were on the way. (*Id.*) Miguel was calling 911 and walking Petitioner off the property when Petitioner abruptly turned around and walked back toward room 118. (*Id.* at 495–96.) Petitioner broke apart a chair outside room 118 and used a piece of it to break a car window in the parking lot. (*Id.* at 496–98.) He broke windows in seven motel rooms and hit another car before the police arrived. (*Id.* at 499–503.) The motel surveillance video was played for the jury and showed Petitioner breaking windows and the police arriving. (*Id.* at 505–06.) The People rested. (*Id.* at 518.)

Christopher Drouin, a Chula Vista Police Officer, testified for the defense that he responded in uniform wearing a body camera to the Holiday Lodge motel on August 9,

2015, where three officers had arrived about thirty seconds earlier. (*Id.* at 523–24.) Petitioner was in the process of being taken into custody and Officer Drouin heard: "Taser, taser, taser," and a "pop" of a taser being discharged. (*Id.* at 524.) He ran up to the other officers and watched as Petitioner thrashed and yelled at the officers while being handcuffed. (*Id.* at 524–25.) Officer Drouin then watched body camera footage from one of the other officers. (*Id.* at 525.) It showed Petitioner holding a large fence post which the officers said they saw him use to break windows and showed him being hit with the taser when he refused to drop it. (*Id.*) Once he was in handcuffs he asked for "the real police," for an ambulance, and to call 911. (*Id.*) Officer Drouin took statements from Kim Schildmeyer and Shannon Tabor, which were recorded on his body camera. (*Id.* at 526–27.) A transcript of Kim's statement is in the record; it is very brief and not inconsistent with her trial testimony. (CT at 53–54.) Although Officer Drouin did not ask either person if Petitioner had threatened them, and although his written report does not contain a report of threats against their lives by Petitioner, he said his body camera recorded Kim reporting that Petitioner said: "Open the door or I'm going to kill you." (RT at 528–32, 544–46.)

Petitioner was transported to the hospital and Officer Drouin waited for him to be medically cleared from being tasered before attempting to conduct a drug recognition evaluation, which he was unable to do because Petitioner refused to cooperate. (*Id.* at 532–34.) Although no blood or urine tests were conducted, Petitioner appeared to Officer Drouin to be under the influence of a controlled substance, as he was sweating, his eyes were watery and bloodshot, he was agitated, and his fingernails were brittle-looking. (*Id.* at 533, 543.) Because room 118 was in such a disordered state, the family was unable to determine if anything was missing. (*Id.* at 534.)

Petitioner testified that he was unemployed at the time of the incident at the Holiday Lodge motel but was starting his own nonprofit organization mentoring youth to keep them from joining gangs. (*Id.* at 560–61.) He is an ex-gang member who disassociated from his gang in 2004. (*Id.* at 561.) He said he had previously been convicted of: residential burglary, which he thought was in 2001, when he entered a house to rob drug dealers "just

for the profit of money"; robbery in 2000, for which he gave no details; and "petty theft that turned into burglary" in 2014. (*Id.* at 561–62.)  The trial judge had granted a pretrial defense motion to bifurcate the trial on the priors and ruled they could come in only if Petitioner testified, and that Petitioner had waived his right to a trial on the priors and admitted he had been convicted of burglary in 2014, and residential burglary in 2002 and 2000. (*Id.* at 342–45.)

Petitioner testified that he injured his back while lifting weights, which paralyzed his left foot and required him to wear a brace on his foot. (*Id.* at 562–63.)  He struggled with addiction to methamphetamine since he was 12 years old, around the time he joined a gang; the drug caused him to be hyper, delusional, and paranoid. (*Id.* at 563–64.) Although he had periods of sobriety, he often relapsed. (*Id.*)  He had a relapse from August 6–9, 2015, which caused hallucinations and delusions. (*Id.* at 564.)  He said people were after him around that time and they had made an attempt on his life the day of the motel incident when they tried to overpower him and throw him in the back of an SUV, and his shirt was torn off when he escaped from a man's grasp, which was why he was shirtless that night. (*Id.* at 565.)  Two days earlier he had an argument with his girlfriend and tried to end their relationship, but she was very possessive, manipulative and clingy, and told him he would be sorry and threatened to send someone from his old gang after him, who were still upset he had disassociated himself from them. (*Id.* at 566–68.)  The next day, he ran into someone he knew from prison who said rumors were being spread about him, and Petitioner assumed they originated with his girlfriend. (*Id.* at 569–70.)

Sometime between 6:00 and 8:00 p.m. on the day of the incident at the motel, Petitioner was approached by someone from a prison gang he had belonged to who knew his gang moniker, Trigger, from his original gang, the Chino Sinners, who said he was wanted at a meeting. (*Id.* at 570-71.)  Petitioner said a gang member being called to a meeting is a very serious matter. (*Id.* at 594-95.)  Shortly after that encounter, the men in the SUV, who were gang members, tried to grab him. (*Id.* at 572.)  After he escaped them, he went to a 7-11 near the motel and asked to call 911, but because he was shirtless,

sweating, and panicked, the store employees wanted nothing to do with him.  (*Id.* at 572–73.)  When two men entered and looked at him, he left the store and walked toward the motel, followed by a car with two men.  (*Id.* at 573–74.)

Petitioner walked past the motel office because he did not see anyone inside and went door-to-door knocking, asking someone to call 911.  (*Id.* at 574.)  The first door to open was room 118; he asked them to call 911 and they told him to go to the office.  (*Id.*)  Petitioner was panicked and in fear of his life and wanted to use the cell phone of the woman in room 118 to call 911; he denied threatening to harm her and denied saying he was going to kill her and her family.  (*Id.* at 575.)  He stopped her from closing her door because he was panicked and knew he would be killed if he did not get into her room.  (*Id.* at 576.)  The car that had followed him had not yet come into the parking lot.  (*Id.*)

When the woman in room 118 closed her door, Petitioner continued asking other people to call 911, including Miguel (the motel manager) and two females who walked past him in the parking lot.  (*Id.*)  Although the two women told Petioner there was nothing they could do, Petitioner said he thought they called 911, and he said Miguel called 911.  (*Id.* at 577.)  Although Petitioner said he knew at least one person had called 911, he testified that he then began breaking windows to get attention and summon the police because nobody was helping him.  (*Id.* at 577–78.)  Miguel began chasing him with a baseball bat as the car that had been following him entered the parking lot.  (*Id.* at 577.)  Petitioner said he panicked, broke the window in room 118, entered the room, and grabbed a cell phone from off a bed, but he was unable to call 911 because the phone was locked.  (*Id.* at 578.)  He heard screaming inside the bathroom and yelled at them to call 911.  (*Id.* at 578–79.)  He did not threaten to kill them but was frantically trying to explain people were trying to kill him.  (*Id.* at 579.)

Petitioner said he understood it was a horrific experience for the people in room 118, looking the way he looked that night, but he was scared and desperate and never intended them any harm.  (*Id.* at 579–80.)  He said the bathroom door was as thin as rice paper and he kicked a hole in it and handed their cell phone through the hole so they could unlock it

and call 911.  (*Id.* at 580.)  All he said to them at that time, and "from beginning to end," was to call 911.  (*Id.* at 580–81.)  He eventually gave up and left the room and saw that the car that had been following him was gone.  (*Id.* at 581.)  The motel manager was outside with a baseball bat and Petitioner asked him again to call 911, but he just told him to leave the property.  (*Id.*)  Petitioner said he did not want to leave the property because he was afraid of the men who were after him and did not want to be alone.  (*Id.* at 581–82.)

When asked by defense counsel why the jury should believe him in light of his past criminal behavior involving entering people's homes and taking things from them, Petitioner explained this was "a complete whole different situation" because he was trying to save his life, and explained he had committed his prior crimes 15 years earlier when he was "young [and] dumb."  (*Id.* at 582.)  He said he began breaking windows in cars and motel rooms after he left room 118 to draw attention and summon the police.  (*Id.* at 583, 590.)  He denied taking any property from room 118, and said he merely handed the cell phone through the bathroom door, which was knocked out of his hand.  (*Id.* at 583–84.)  When the police arrived at the motel, they surrounded him and tasered him, at which time he was "definitely amped up," either still feeling the effects of methamphetamine or the adrenaline of the situation.  (*Id.* at 584.)  He said the paramedics gave him a shot to counteract the effects of the methamphetamine which caused him to pass out in the police car.  (*Id.* at 584–86.)  He did not remember anything after that and said the officers never gave him a chance to explain himself.  (*Id.*)

During cross-examination, which was brief, Petitioner admitted the surveillance video showed that he walked past several people without speaking to them and, in fact, had chased some with a stick, despite testifying he asked everyone he encountered for help. (*Id.* at 587–89.)  As relevant to claim one here, the prosecutor asked Petitioner about the details of his prior convictions.  (*Id.* at 595–96.)  Petitioner answered that he broke into the home of Lucy Aloyiam in 2000 with the intent to steal from her, not to get help; and in 2002, while armed with a gun, he entered the home of a drug dealer named Tina Black, while her 10-year old daughter was home, with the intent to steal from her, not to ask for

help.[2]  (*Id.*)  On redirect, he said he had not noticed the people on the surveillance video he passed without asking for help, who were in any case too far away from him to ask for help.  (*Id.* at 597–98.)

Lisa Salcido testified that Petitioner is her boyfriend and that they have been in an on-and-off relationship since 2011.  (*Id.* at 600.)  In the days before the motel incident on August 9, she and Petitioner were homeless, staying in Tijuana, and got into an argument about him cheating on her.  (*Id.* at 600–01.)  On the day of the incident, she ended their relationship and tried to scare him by threatening to send someone after him, but she did not know any gang members.  (*Id.* at 601–03, 611–12.)  On cross-examination, she said she never used drugs and that Petitioner never used drugs in front of her, although she was aware Petitioner occasionally used drugs.  (*Id.* at 615–16.)  She said that when he did use drugs, he normally used heroin, not methamphetamine, and she did not see him use drugs the day of the incident or the day before.  (*Id.*)

Dr. Clark Smith, a medical doctor running a drug and alcohol treatment program called Recovery Works, testified about methamphetamine-induced psychosis, a toxic effect of high doses of methamphetamine use over several days.  (*Id.* at 641-46.)  He said this type of psychosis can mimic symptoms of mental illness, such as schizophrenia, and cause hallucinations and paranoid delusions.  (*Id.*)  He also said such a condition could include tunnel vision and impair the ability to form intent, and that a paramedic would be likely to give an injection of a tranquilizer to a patient suffering from psychotic behavior.  (*Id.* at 651–54.)  Based on his review of police reports containing observations of Petitioner's behavior on the night of the motel incident, as well as audio and visual recordings of the events, he opined that Petitioner's behavior was indicative of having ingested a controlled substance, *id.* at 650, 678, and that Petitioner was suffering from

---

[2]  The trial judge ruled at a pretrial hearing that the fact and nature of the prior convictions were admissible to impeach Petitioner if he testified, but the details could come in only if the defense opened the door, such as by Petitioner testifying he did not enter room 118 with the requisite intent, and the parties were to seek guidance at sidebar.  (RT at 308–10, 318–24.)  Just prior to cross-examination, at an unrecorded sidebar, the trial judge apparently ruled the defense had opened the door.  (*Id.* at 586.)

18-CV-2900 JLS (MSB)

methamphetamine-induced psychosis with severe agitation and paranoid delusions that night. (*Id.* at 656–58.) He also said that Petitioner insisting on summoning the police and giving a true name are behaviors not indicative of criminal behavior. (*Id.* at 656–58.) He said it is typical that people under the influence of drugs and alcohol have patchy memories and an inability to remember all events. (*Id.* at 660.)

On cross-examination, Dr. Smith said he had testified over 200 times in the past 30 years, about half in criminal cases and half in civil cases, and in the criminal cases he had testified for the defense 95 percent or more of the time. (*Id.* at 659.) As relevant to claim two here, over repeated relevancy objections by defense counsel, the prosecutor asked him about seven other cases in which he had testified as an expert, pointing out that in those other cases, unlike this one, there were blood tests indicating the level of drugs or alcohol in the defendants' system and their medical histories. (*Id.* at 667–73.) Dr. Smith said he was not aware Lisa Salcido said she did not see Petitioner use drugs and was asked if his opinion was based on speculation whether drugs were involved. (*Id.* at 673–77.) He said that although there was no medical proof Petitioner was intoxicated, based on his training and experience, Petitioner's conduct that night was most consistent with methamphetamine-induced psychosis. (*Id.* at 677.) The defense rested and there was no rebuttal. (*Id.* at 679.)

The jury was then instructed. (*Id.* at 680–703.) As relevant to claim three, they were instructed that for burglary, the prosecution was required to prove Petitioner entered the motel room with the specific intent to commit theft, assault with force likely to produce great bodily injury, or to make a criminal threat, but were also instructed that assault required only general intent. (*Id.* at 690–94, 696–97.) The attorneys presented argument. (*Id.* at 704–61.) As relevant to claim four, the prosecutor, in referencing Petitioner's prior convictions, referred to facts not in evidence when he said that during the 2002 robbery, Petitioner held "a gun to them," referring to the mother and her ten-year-old child, (*id.* at 748), mentioned the child's name (*id.* at 758), and implied that the mother was not a drug dealer (*id.* at 748).

The jury deliberated for about six hours over two days, during which they had Kim Schildmeyer's testimony read back and asked a question about the elements of theft.  (RT at 782; CT at 225-26.)  They reached a verdict on counts one and three but deadlocked on count two, making a criminal threat, with ten voting for guilty and two not guilty.  (RT at 782; CT at 225-26.)  They found Petitioner guilty of burglary of an inhabited building and guilty of vandalism over $400.  (CT at 228, 230.)  The trial judge denied a motion to strike the prior convictions and sentenced Petitioner to 36 years-to-life on count one and a consecutive five-year term on count two, for a total sentence of 41 years-to-life.  (RT at 821–22; CT 232–33.)

## III.   Petitioner's Claims

Petitioner raises the following claims:

(1)   The ruling by the trial court to allow the admission of details of the prior convictions, on the basis that the defense had opened the door through Petitioner's testimony that he entered room 118 without criminal intent, was error because his prior convictions were not relevant to his intent and was particularly prejudicial because of the ambiguous or conflicting jury instructions on intent and the improper argument by the prosecutor that the priors were relevant to show he intended to harm the family or steal from them.  (ECF No. 1 at 25–28.)

(2)   The trial court erred in allowing the prosecutor to cross-examine defense expert Dr. Smith regarding his opinions in seven unrelated cases because they were not relevant to show bias or challenge his opinion, and it was particularly prejudicial in light of the prosecutor's argument that Dr. Smith had a bias in favor of defendants.  (*Id*. at 30–32.)

(3)   The jury received ambiguous or contradictory instructions regarding the intent element of burglary because they were instructed Petitioner needed specific intent to commit assault, theft, or criminal threats when he entered room 118, but were instructed that assault was a general intent crime.  (*Id*. at 32–35.)

///

///

(4)   The prosecutor committed misconduct by arguing facts not in evidence and mischaracterizing the law regarding the proper use of Petitioner's priors, and he received ineffective assistance of counsel by defense counsel's failure to object.  (*Id.* at 35–37.)

(5)   The cumulative effect of those errors was prejudicial because they fatally crippled his defense and unfairly bolstered the prosecution case.  (*Id.* at 37–38.)

## LEGAL STANDARD

Under the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), in order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."  *Id.* at 407. In order to satisfy § 2254(d)(2), the factual findings relied upon by the state court must be objectively unreasonable.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## I.   Claim One

Petitioner alleges in claim one that the ruling by the trial court to allow introduction of details of his prior convictions on the basis that the defense had opened the door was prejudicial error, particularly in combination with argument by the prosecutor that they

were relevant to show he intended to steal from or harm the family, and the ambiguous or conflicting jury instructions on intent.  (ECF No. 1 at 25–28.)

Respondent answers that claim one is not cognizable on federal habeas because it relies on an error of state law only, as the only mention of federal law is in Petitioner's cumulative error claim where he characterizes all his claims as "errors of federal constitutional magnitude."  (ECF No. 9-1 at 19–20.)

Petitioner presented this claim to the state appellate and supreme court on direct appeal.  (Lodgment Nos. 12, 14, 16.)  The appellate court denied the claim in a reasoned opinion and the supreme court summarily denied review.  (Lodgment Nos. 15, 17.)  The Court applies AEDPA's standards to the last reasoned state court decision, in this case the appellate court opinion on direct appeal.  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803–06 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground.")).

The appellate court stated:

Vasquez contends the trial court abused its discretion by allowing the prosecutor to cross-examine Vasquez regarding two prior offenses because they were too dissimilar to the charged burglary to have any relevance.

   *a.  Pretrial Ruling*

Before trial, the prosecutor moved to admit evidence that Vasquez committed two prior offenses, both for impeachment purposes and to prove Vasquez's intent in the charged case under Evidence Code 2 section 1101, subdivision (b).  At the in limine hearing on this motion, the prosecution explained the proffered evidence was the change of plea form in which Vasquez pleaded guilty to entering the home of Lucy Aloyiam in 2000 with the intent to commit larceny or a felony.  In the second (2002) case, the proffered evidence was the transcript of a hearing at which Vasquez pleaded guilty to entering the home of Tina Black with a firearm and taking property from her immediate presence.

Defense counsel opposed the motion, contending that no mention of those convictions should be permitted.   She first argued those priors were

inadmissible under section 1101, subdivision (a), and were too dissimilar to be admitted under section 1101, subdivision (b), or should be excluded under section 352. She alternatively asserted that, even if those convictions were to be admitted to impeach his veracity if he testified, the convictions should be "sanitized" by limiting the prosecution to showing Vasquez had been convicted of a crime of moral turpitude.

The court first ruled the prior convictions qualified as crimes of moral turpitude, and could be used to impeach Vasquez if he testified. Although the convictions would not be "sanitized," the court determined that the facts of the underlying offenses would not be germane for this purpose. Vasquez does not challenge this aspect of the court's ruling.

The court then analyzed the second purpose for which the prosecution sought to admit the prior offenses as relevant evidence of intent under section 1101, subdivision (b). The prosecutor argued the prior offenses were admissible on the issue of Vasquez's intent when he broke into the hotel room here because Vasquez did not steal anything from the victims. He asserted that, because Vasquez entered with the intent to steal in the prior offenses, those crimes tended to show he entered with the intent to steal in the charged case.

After noting the prior offenses sounded like standard residential burglaries while the charged case was like "a horror movie," the trial court ruled the prior offenses were not similar enough to be admitted in the People's case-in-chief on the issue of Vasquez's intent under section 1101, subdivision (b). Although ruling the prosecution could not use the prior crimes in its case-in-chief, the court also cautioned that the defense might "open the door" to utilizing the evidence if, for example, the defense psychiatric expert opined that Vasquez "couldn't" form the requisite intent. The court also observed that, "(d)epending on how he words things" in his answers on direct examination, Vasquez might open the door to additional cross-examination (beyond the fact and nature of his prior convictions) regarding additional details of his prior crimes, but "it depends on how he says what he says . . . (a)nd you come sidebar to me, Mr. Ou (the prosecuting attorney), before . . . ."

### b. *Trial Evidence, Instructions, and Argument*

Consistent with the court's pretrial ruling, the prosecution did not introduce any evidence of Vasquez's prior convictions in its case-in-chief. Vasquez elected to testify in his own defense and emphasized that his course of conduct
///

16

18-CV-2900 JLS (MSB)

over the entire episode was an effort to obtain help, beginning at a 7-Eleven store and continuing thereafter at the motel.

Anticipating that his prior convictions would be admissible for impeachment purposes, Vasquez's testimony on direct examination included descriptions of the two incidents. He described the first offense as a residential burglary in 2000 "just for the profit of money," which he asserted was a "petty theft" that "(t)urned into burglary." Regarding the later offense, he testified he "(w)ent into a house to rob some drug dealers and got in trouble." Defense counsel later asked him, "Knowing that your past convictions involved people being inside their homes and you going in and trying to take things from them(,) (¶) . . . (¶) . . . why should the jury believe that that is not what you were trying to do this time?" Vasquez answered, "That is a . . . complete(ly) whole different situation. (¶) . . . (¶) . . . I was trying to save my own life (this) time," while the prior events were 15 years ago and he "was young, dumb, thought differently, acted differently, and just completely opposite."

Before commencing cross-examination, the prosecutor held an unreported sidebar conference with the court. The prosecutor then sought to discredit Vasquez's claim that he was "asking everybody for help" by playing a video showing Vasquez in the parking lot where there were passersby from whom he did not request help. Instead, the video apparently showed Vasquez chasing the people with a stick. The prosecutor then questioned Vasquez's claim that he went into the victim's hotel room seeking help by soliciting confirmation that, when he entered the homes of the prior victims, he was not seeking help but instead did so with the intent to steal or to commit a felony. He also clarified that the drug dealer Vasquez referred to was a woman named Tina Black, and not her 10-year-old daughter, and that Vasquez had entered Black's house with a gun.

Because both sides had now discussed the significance of Vasquez's prior convictions as bearing on his mental state when he entered the motel room, the trial court instructed the jury on the limited purpose for which the prior offenses evidence could be employed in assessing intent.* In closing argument, the defense asserted that Vasquez was just trying to get help, particularly in light of his intoxicated state, and that because the evidence permitted the reasonable inference that such was his intent when he broke in, the law requires (among two reasonable conclusions) that the jury accept the one pointing to innocence rather than the one pointing to guilt. Defense counsel argued that all of Vasquez's actions, from approaching the victims the first time and trying to push his way in, to breaking windows and approaching

others with the stick, to entering the motel room and kicking through the door, were attributable to his goal of drawing attention and getting police to respond to the scene, and his conduct was understandable when viewed through the prism of his methamphetamine ingestion and resulting paranoid delusions.

> *Footnote:   The court employed the standard instruction to explain that, as to the prior two offenses, "you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant acted in this case with the intent to commit theft or assault with force likely to produce great bodily injury or to make criminal threats during the burglary charged in count 1. (¶) In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and this charged offense. (¶) Do not consider this evidence for any other purpose. (¶) Do not conclude from this evidence that the defendant has a bad character or is disposed to commit such crimes. (¶) If you conclude the defendant committed the uncharged acts, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of burglary.  The People must still prove each charge and allegation beyond a reasonable doubt."

In rebuttal argument, the prosecutor noted the defense appeared to be relying on voluntary intoxication to rationalize Vasquez's conduct, but asserted that "(s)ometimes . . . the answer is simple.  Some people are just flat mean," such as a person who would "go into a woman's home with her 10-year-old daughter and hold a gun to them and then blame them for being drug dealers." The prosecutor also told the jurors that, when evaluating Vasquez's claim of voluntary intoxication and its impact on his intent, they could also consider his prior convictions because "history tells us that when he enters somebody else's home he intends to steal or commit a felony."

> c. *Law and Analysis*

In California, "(e)xcept as otherwise provided by statute, all relevant evidence is admissible." (§ 351.)  One statutory limitation on admissibility is section 1101, subdivision (a), which "generally prohibits the admission of a criminal act against a criminal defendant 'when offered to prove his or her conduct on a specified occasion.'"  (*People v. Harrison* (2005) 35 Cal.4th 208, 229.) However, section 1101, subdivision (b) permits evidence that a person

committed another crime to be admitted when it is relevant to prove a material fact other than the person's character or disposition, such as motive, intent, plan, knowledge, identity, or absence of mistake or accident. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, 402–403 (*Ewoldt*).) "The admissibility of such evidence turns largely on the question whether the uncharged acts are sufficiently similar to the charged offenses to support a reasonable inference of the material fact they are offered to prove." (*People v. Erving* (1998) 63 Cal.App.4th 652, 659–660, citing *Ewoldt*, at p. 393.)

Evidence of other crimes can provide circumstantial evidence from which intent may be inferred and, "(a)s with other types of circumstantial evidence, its admissibility depends upon three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence." (*People v. Thompson* (1980) 27 Cal.3d 303, 315.) Vasquez concedes his intent was a material fact to be proved, and therefore we must examine whether the evidence of his prior offenses had a tendency to prove or disprove his intent, and whether there exists any rule or policy requiring the exclusion of that evidence.

In *Ewoldt*, our Supreme Court explained that prior misconduct can be relevant to proving a disputed material fact depending on the similarity between the circumstances of the prior acts and the charged offenses, and the degree of required similarity varies depending on the fact to be proved. (*Ewoldt, supra*, 7 Cal.4th at pp. 401–402.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. (Citation.) '(T)he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' ((Quoting 2 Wigmore, Evidence (Chadbourn rev. ed. 1979) § 302, p. 241.)) In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor(ed) the same intent in each instance." (Citations.)' ((Quoting *People v. Robbins* (1988) 45 Cal.3d 867, 879.))" (*Ewoldt*, at p. 402.)

Even if the evidence would otherwise be admissible to prove intent, a trial court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

(§ 352.)  The undue prejudice section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence . . . . "(It) applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"  (Citation.)'"  (*People v. Lopez* (2013) 56 Cal.4th 1028, 1059, disapproved on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

A trial court's ruling on the admissibility of other crimes evidence is reviewed under the deferential abuse of discretion standard.  (*People v. Jones* (2013) 57 Cal.4th 899, 930.)   The trial court's decision "will be upheld unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner."  (*People v. Thomas* (2012) 53 Cal.4th 771, 809.)

Here, the trial court initially ruled that evidence of Vasquez's two prior offenses would not be admissible on the issue of his intent.  He would have been entitled to, and the jury presumably would have received, a limiting instruction indicating that the prior crimes evidence could only be considered for purposes of impeachment.   But the situation changed when defense counsel elicited Vasquez's testimony that the present case was a "complete whole different situation" from his two prior offenses because, unlike those cases, here he had an innocent intent when he broke into the motel room.  In other words, it was Vasquez who invited the jury to consider the extent to which the two prior offenses cast light on his intent in entering the motel room.  Having done so, he can hardly complain that the prosecutor was permitted to briefly cross-examine him regarding his two prior offenses, or that the court then instructed the jury on how to evaluate the evidence as it related to the issue of intent.

Even if consideration of the prior crimes evidence on the question of intent was not invited by Vasquez, we could not conclude that the trial court abused its discretion in allowing it to be considered for purposes of Evidence Code section 1101, subdivision (b).  In this case, as on two prior occasions, Vasquez entered a dwelling.  On each of the two prior occasions, he admitted he entered with the intent to steal or to commit a felony.  Moreover, it appears that on each prior occasion, as here, he entered the dwelling undeterred by the fact that people were present inside the dwelling.**  Because *Ewoldt* has held the least degree of similarity between charged and uncharged acts is needed to receive prior crimes evidence on the issue of intent (*Ewoldt, supra*, 7 Cal.4th ///

at p. 402), the trial court's decision to admit the evidence under section 1101, subdivision (b) was not arbitrary, capricious, or patently absurd.

> **Footnote: Indeed, the evidence permits the conclusion that on each prior occasion he entered the dwelling believing only females were present inside, and the evidence here suggests that Vasquez may have been unaware that there were occupants of the motel room other than females.

Vasquez contends that his prior offenses were too dissimilar to be relevant to his intent in the charged case.  Certainly, there may have been differences,*** but the ability of a defendant to identify alleged differences does not render the trial court's ruling an abuse of discretion.  (*People v. Jones, supra*, 57 Cal.4th at p. 931.)  "(S)uch distinctions (go) to the weight of the evidence and (do) not preclude the prosecution from introducing the evidence." (*People v. Carter* (2005) 36 Cal.4th 1114, 1148.)  On this record, we cannot conclude the trial court abused its discretion in permitting limited cross-examination of Vasquez's claim that the prior convictions were a "complete whole different situation" from the present case.  (Cf. *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 72 (prosecution may cross-examine to explain or rebut adverse testimony or inferences developed by defense examination and ""'(i)t matters not that the defendant's answer on cross-examination might tend to establish his guilt of a collateral offense"''").)

> ***Footnote: Vasquez identifies three principal differences: he did not claim justification in the prior offenses, he was allegedly acting here while intoxicated on methamphetamine, and he was here engaged in irrationally destructive behavior.  However, the first "distinction" merely reiterates the issue to be decided by the jury: should his disclaimer of culpable intent here be credited in light of his admission of culpable intent in the prior offenses?  The second "distinction" - that here he was intoxicated on methamphetamine - ignores his admission that he used methamphetamine since he was 12 years old.  Whether he was actually under the influence of methamphetamine at the time of the two prior offenses is unclear.  Thus, the only marked distinction is that he was more destructive and irrational here than in the prior offenses.

Vasquez argues that even if the court did not abuse its discretion by finding the evidence admissible under section 1101, subdivision (b), it was an abuse

21

of discretion to admit the evidence under section 352 because its probative value was outweighed by its potential to prejudice the fact finder, to confuse the issues, or to consume undue time. We conclude the risk of undue prejudice was minimal because the prior offenses were not "particularly inflammatory compared to" the charged conduct. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25.) The 2000 conviction involved a single victim, and the 2002 conviction, although involving an incident in which a 10-year-old girl may have been present, is no more inflammatory than the circumstances of the present case, in which a five-year-old child was present. Moreover, because Vasquez had been convicted of the prior offenses, the risk of undue prejudice was further diminished because the jury would not feel any need to punish Vasquez for his prior conduct. (*Ewoldt, supra*, 7 Cal.4th at p. 405.) Additionally, because the trial court properly ruled the prior convictions were admissible for impeachment purposes, the additional testimony about those crimes was only of minimal incremental impact. Finally, the court's instructions on the limited purpose of the evidence "eliminated any danger of 'confusing the issues or misleading the jury.'" (*Lindberg*, at pp. 25–26 (jury presumed to have followed court's limiting instruction).) We conclude the trial court did not abuse its discretion by allowing limited cross-examination on the prior offenses.

(Lodgment No. 15, *People v. Vasquez*, No. D070638, order at 7–17.)

Respondent contends this claim is not cognizable on federal habeas because it alleges only state evidentiary error. It is well settled that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993) (holding that federal habeas courts "are bound by a state court's construction of its own penal statutes.") However, there is a long-recognized exception to that general rule where a state court's application of state law is arbitrary or capricious. *See Richmond v. Lewis*, 506 U.S. 40, 50 (1992) (holding that a state court's application of state law does not rise to the level of a federal due process violation unless it was so arbitrary or capricious as to constitute an independent due process violation); *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir.

1982) ("Federal courts will not review a state supreme court's interpretation of its own statute unless that interpretation is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution.") (citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 n.11 (1975); *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 129 (1945); *Ward v. Love Cty.*, 253 U.S. 17 (1920); *Terre Haute & I. R. Co. v. Indiana*, 194 U.S. 579 (1904)). In addition, "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984).

Petitioner characterized claim one as presenting an error "of federal constitutional dimension" both here and in state court. (ECF No. 1 at 37; Lodgment No. 12 at 78–79.) "The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of pro se litigants." *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987) (quoting *Boag v. MacDougall*, 454 U.S. 364, 365 (1982)); *see also Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001) (holding that liberal construction of pro se prisoner petitions is especially important as to which claims are presented). Construing the Petition here liberally, Petitioner states a federal claim because he alleges the error by the trial judge in admitting the details of his prior convictions, in combination with the prosecutor's improper use of them to attack his character and the confusing jury instructions on intent, resulted in a fundamentally unfair trial in violation of federal due process. *Richmond*, 506 U.S. at 50; *Trombetta*, 467 U.S. at 485; *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.").

Petitioner testified on direct that his prior convictions for entering homes with the intent to rob their inhabitants was "completely opposite" and a "complete whole different situation" from the instant offense where he entered the room with the intent to summon the police, because here: (a) his life was in danger, (b) he was not thinking straight or acting rationally due to being under the influence of methamphetamine, and (c) he was no longer young and dumb as he had been 15 years earlier, and had quit the gang life. (RT at 582.)

However, evidence was presented which contradicted that characterization. His girlfriend testified he used heroin, not methamphetamine, and she did not see him use drugs that day or the previous day. (*Id.* at 616.) Kim Schildmeyer testified Petitioner was grinning and looked happy having misdirected the motel manager and misled him that he was not the person who had tried to enter her room, which her daughter testified she overheard, and then denied he was that man when she pointed him out to the manager. (*Id.* at 401, 457–58.) Surveillance video showed he walked past several people without asking for help and chased some with a stick. (*Id.* at 587–89.) The motel manager testified he asked Petitioner who he was and if he was a guest, but Petitioner did not ask him to call 911. (*Id.* at 511.) All this evidence contradicts Petitioner's testimony he was only trying to find someone to call 911, as well as his testimony he was not threatening the occupants of room 118 but merely telling them he was going to be killed. The jury was in the position to determine who was telling the truth and whether to accept the expert testimony that any inconsistencies in Petitioner's testimony could be explained by methamphetamine-induced psychosis. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[T]he assessment of the credibility of witnesses is generally beyond the scope of [federal habeas] review.").

In addition, Petitioner was somewhat vague on direct when he characterized his 2000 burglary conviction as robbery. (RT at 561–62.) It was not fundamentally unfair to permit Petitioner to be briefly cross-examined to clarify details of his prior convictions after he mischaracterized a burglary conviction as robbery while on trial for burglary, and after he invited the jury to draw a comparison between his priors where he admitted criminal intent and this case where he only sought help. That is particularly true because of his testimony that he only asked for help, which conflicted with the testimony of every eyewitness. Also, the jury was merely apprised of the additional facts that the victims in the prior offenses, like this one, were female and, in one instance, a child. The only dissimilar fact, that he used a gun in one of the prior burglaries, was used by defense counsel in closing to argue it supported his defense because he was not armed here. (*Id.* at 727.) This Court is bound by the state court determination that the similarities of the prior burglaries and current

offense, coupled with his invitation to the jury to compare them, rendered them relevant and admissible under state law. *Bradshaw*, 546 U.S. at 76.

Petitioner has failed to show that the admission of such relevant and unprejudicial evidence rendered his trial fundamentally unfair. *See Dowling v. United States*, 493 U.S. 342, 353 (1990) (holding that introduction of details of a prior similar crime *for which the defendant had been acquitted* did not render the trial fundamentally unfair because it did not violate "those fundamental conceptions of justice which lie at the base of our civil and political institutions . . . which define the community's sense of fair play and decency.") (internal citations and quote marks omitted). Thus, the determination by the appellate court that the trial judge's decision to admit details of the prior convictions was "not arbitrary, capricious, or patently absurd," is neither contrary to, nor an unreasonable application of, clearly established federal law, nor an unreasonable determination of the facts. That conclusion is not changed by the effects of the allegedly confusing jury instructions on intent and the alleged prosecutorial misconduct in arguing the prior convictions could be used by the jury to attack Petitioner's character, because, as discussed below, they are neither errors nor prejudicial.

Petitioner has failed to show that the admission of the details of his priors rendered his trial fundamentally unfair, *id.*, was "so arbitrary or capricious" as to constitute a due process violation, *Richmond*, 506 U.S. at 50, or "is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution." *Knapp*, 667 F.2d at 1260. The state court adjudication of claim one is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

## II.   Claim Two

Petitioner alleges in claim two that the trial court erred in allowing the prosecutor to cross-examine defense expert Dr. Smith regarding his opinions in seven unrelated cases because they were not relevant to his bias in this case, and argues the prejudice was increased by the prosecutor's argument that Dr. Smith had a bias in favor of defendants.

(ECF No. 1 at 30–32.)  As with claim one, Respondent answers that claim two does not present a federal claim because it is based on a state evidentiary ruling.  (ECF No. 9-1 at 21.)  The Court rejects Plaintiff's contention for the same reason as claim one.  The appellate court opinion is the last reasoned state court decision; it states:

> Vasquez next asserts the trial court abused its discretion by allowing the prosecutor to cross-examine defense expert Dr. Clark Smith about his opinions expressed in seven other cases, arguing the other cases were irrelevant to the validity of Dr. Smith's opinions in Vasquez's case.  Even assuming Vasquez preserved this claim, we conclude the prosecutor's questions regarding Smith's prior cases were proper in suggesting why the doctor's opinion in this case should be disregarded because it was rendered without the type of data and preparation that ordinarily accompanied his opinions.

>    *a. Background Facts*

> On cross-examination Dr. Smith testified that in 95 percent of the criminal cases in which he testified as an expert, he was a defense expert and was paid at the rate of $400 per hour for his services.  The prosecutor also elicited Smith's admission that, although he had relied on Officer Drouhin's [sic] report in forming his opinion, Drouhin [sic] had been unable to conduct an evaluation of Vasquez or perform a variety of tests.  Smith, who testified on direct that his opinion was based solely on the police reports and the body camera films of Vasquez's behavior at the hotel, also conceded he did not review the results of the blood tests taken at the hospital to which Vasquez was transported to determine if Vasquez had any traces of methamphetamine in his blood.

> The prosecutor then sought to examine Dr. Smith about opinions he formed in seven other cases.  The first case from 2003 involved "somebody entering somebody's house and attacking them with a knife," where the defendant was found to have a blood alcohol content of .04 plus methamphetamine in his blood.  Smith did not remember the case, but did affirm he is often asked to opine on the possible impact on decision making when there is methamphetamine in a defendant's blood system.  In a second case from 2003, which Smith also could not recall, he testified in support of a claim of self-defense in which the medical examiner apparently found alcohol, cocaine, and Valium in the victim's system.  The prosecutor quoted Smith as testifying that "people under the influence can exhibit a range of behaviors from mild

intoxication to marked psychosis, agitation, and (violent) behavior."

The prosecutor next examined Dr. Smith about a 2008 case involving Estracio Navilla in which Smith, after examining Navilla and his medical records, opined that he suffered from a long-standing severe psychiatric disorder and chronic paranoid schizophrenia. The prosecutor asked Smith if he would be able to reach such an opinion "from personally interviewing that person and looking at his medical records," and Smith answered "(y)es." The prosecutor next examined Smith about a 2010 carjacking case in which the defendant apparently had a blood alcohol content of .24 and a 10-year history of mental issues, which led the doctor to opine that the defendant suffered from posttraumatic stress disorder and was likely to experience blackouts that would cause him not to remember his actions. Smith affirmed he has evaluated people with those symptoms and is able to opine as to whether someone is more likely than another to experience blackouts.

In a fifth case, which was tried in 2015 but Dr. Smith could not recall, the defendant had a large amount of methamphetamine in his blood. According to the prosecutor, Smith opined that "methamphetamine causes overstimulation, overloads the brain's capacity to handle information, causes the brain to shut down the production of adrenaline, that it can cause severe psychosis, confusion, distortion, reality distortion, and suggestibility." Smith agreed that sounded like an opinion "within the spectrum of something that (he) would opine." A sixth case involved a Ms. Duran, who claimed self-defense after she killed a man. The decedent had high levels of methamphetamine and amphetamine in his blood. Smith had apparently opined that (1) people under the influence of methamphetamine will act emotionally, rapidly, and unpredictably, (2) extended use can lead to paranoia and violent behavior, and (3) methamphetamine users can be sexually aggressive and actually believe that sex is consensual even when it is not. The final case was one in which he gave an opinion in a sexually violent predator proceeding, and in which Smith apparently opined that the prisoner was not likely to re-offend if released.

After surveying these cases, the prosecutor immediately noted that "in most of these cases that we talked about, there is some evidence of drugs, meth, or whatever, cocaine in the person's blood. And in some of these instances, you actually talked to the person, looked at his medical history and determined what it is about him, whether there is a mental deficiency or whether there is dependence on controlled substance. Those are the things you look for, right?" Dr. Smith agreed. The prosecutor then asked, "In this case you know

nothing about what was in his blood at the time of his arrest?" and Smith conceded he had not seen any test results quantifying or even mentioning the amount of methamphetamine in Vasquez's blood in the medical records from the hospital.  The prosecutor then asked, "(T)o determine whether somebody was indeed suffering from psychosis in the past, you actually interviewed people, right?  In some of those cases I just asked you about?"  Smith conceded he had interviewed some of them and that such an interview could be important to "get a sense of how often this person uses" or to learn "whether there (are) any mental problems that may exacerbate or attribute (sic) to the drug issue."  The prosecutor then elicited Smith's admissions that he (1) had not interviewed Vasquez, (2) did not know Vasquez's mental history, (3) had "no idea" about Vasquez's tolerance levels for methamphetamine or his usage patterns (apart from Vasquez's own claims about how much he used), and (4) was unaware that a witness testified she was with Vasquez in the hours before the incident and had never seen him using methamphetamine.

### b. Analysis

"'(T)he scope of cross-examination of an expert witness is especially broad . . . .' (Citations.) 'A party "may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution (is) entitled to attempt to discredit the expert's opinion."'" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 123.)  "An expert witness may be cross-examined as to 'the matter upon which his or her opinion is based and the reasons for his or her opinion.' ((Quoting § 721, subd. (a).))  The scope of cross-examination permitted under section 721 is broad, and includes examination aimed at determining whether the expert sufficiently took into account matters arguably inconsistent with the expert's conclusion." (*People v. Ledesma* (2006) 39 Cal.4th 641, 695.)  When an expert's diagnosis relies heavily on "information provided by defendant . . . the prosecution (is) entitled to ask questions challenging the accuracy of that information." (*People v. Seaton* (2001) 26 Cal.4th 598, 681.)

A fair reading of the cross-examination does not, as Vasquez contends, show the prosecutor was improperly attempting to undermine Dr. Smith's credibility by calling into question the accuracy of his diagnosis in other cases, as was criticized by the court in *People v. Buffington* (2007) 152 Cal.App.4th 446.6.*  Instead, the prosecutor's questions were designed to compare and contrast the methodology used to reach (and factual underpinnings for) his opinions in other cases with what he relied on and how he reached his

conclusions in this case: Smith admitted that (unlike other cases) he did not interview Vasquez; he admitted that, unlike other cases, he had no information suggesting Vasquez had a preexisting schizophrenic condition; he admitted that, unlike other cases, he had no blood tests verifying Vasquez was in fact under the influence of methamphetamine and indeed had not considered the evidence from a percipient witness that she had not seen Vasquez consuming methamphetamine. We conclude the questions involving the other cases were relevant for the jury to assess the reliability of Smith's opinions regarding Vasquez's mental state.

> *Footnote: In *Buffington*, the court "beg(an) with the evidence that was admissible to show (the expert's) bias and then contrast that evidence with the evidence at issue here and explain why it was not relevant." (*People v. Buffington, supra*, 152 Cal.App.4th at p. 454.) The court acknowledged the fact the expert routinely reached conclusions favorable to the defense, and was well paid, was relevant and admissible because "(a)s a matter of common sense, the fact that a well-paid expert witness routinely offers opinions in favor of SVP defendants in a great number of cases has some tendency in reason to prove he is not being entirely objective in formulating his opinion." (*Id.* at p. 445.) However, the court found the cross-examination about his opinion in three particular cases favorable to the defense was not relevant to the credibility of his opinion in the present case unless the prosecution introduced contrary expert testimony suggesting he should have reached a different conclusion, because "(w)ithout such contrary expert testimony . . . the only thing the jury had to rely on in questioning Dr. Donaldson's opinion . . . was its own lay instinct." (*Id.* at p. 455.) Here, in contrast, the prosecution's cross-examination focused on how Dr. Smith reached his opinions in the prior cases.

(Lodgment No. 15, *People v. Vasquez*, No. D070638, order at 17–22.)

As with claim one, Petitioner is not entitled to federal habeas relief unless he can show his trial was rendered fundamentally unfair because the admission of Dr. Smith's opinions in the other cases violated "those fundamental conceptions of justice which lie at the base of our civil and political institutions . . . which define the community's sense of fair play and decency," *Dowling*, 493 U.S. at 352, was "so arbitrary or capricious" as to constitute a due process violation, *Richmond*, 506 U.S. at 50, or that the state court ruling

18-CV-2900 JLS (MSB)

"is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution." *Knapp*, 667 F.2d at 1260.

Petitioner argues that Dr. Smith's seven other cases, only three of which involved methamphetamine, were not relevant to his bias in this case or whether his opinion in this case was wrong and therefore constituted improper impeachment, because they were not so extreme as to indicate Dr. Smith's opinions in those cases reflected an inability to be objective in this case. In other words, they did not support the prosecution argument that Dr. Smith was a hired gun for the defense. However, the state court correctly found those other cases were relevant to Dr. Smith's ability to form an opinion regarding the effects of drugs on Petitioner absent any medical evidence he was under the influence, which was an antecedent issue underlying his expert opinion that Petitioner's behavior was consistent with methamphetamine-induced psychosis. Petitioner claims he was prejudiced because the prosecutor argued in closing on rebuttal, without an opportunity for the defense to respond, that:

> Dr. Smith is kind of interesting. He'll give you an opinion about just about anything. He'll give you an opinion about anything. If this is a case about the victim being an aggressor, he'll tell you the victim was high. In this case there is an issue about memory. Well, guess what? He's got an opinion about memory too. He'll testify about anything, including whether or not somebody ought to be released. And he'll predict eventually whether or not that person can commit a future sexually violent offense. It's, like, an expert jukebox; you put in a quarter and spin the dial and get your opinion that helps your defense. That's Dr. Smith. So you ought to consider that.

(RT at 753–54.)

Petitioner contends that if the jurors had not heard that argument and had not heard Dr. Smith cross-examined on his other cases, it is reasonably probable one or more jurors would have considered Petitioner's testimony, and his defense, to be more credible. However, the challenged argument and cross-examination are consistent with Dr. Smith's testimony that he testified for the defense in 95 percent or more of the 100 criminal cases in which he testified, and merely highlighted the fact that in seven of those cases, unlike

18-CV-2900 JLS (MSB)

here, his opinion was based on medical evidence of intoxication. *See Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (recognizing prosecutors are permitted to argue reasonable inferences from evidence presented at trial). Petitioner has failed to show the argument and cross-examination on relevant and contested issues violated "those fundamental conceptions of justice which lie at the base of our civil and political institutions . . . which define the community's sense of fair play and decency," so as to cause a fundamentally unfair trial. *Dowling*, 493 U.S. at 352. He has failed to show that the state court ruling was so "arbitrary or capricious" as to constitute a due process violation, *Richmond*, 506 U.S. at 50, or that it "is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution." *Knapp*, 667 F.2d at 1260.

The state court adjudication of claim two is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

## III.  Claim Three

Petitioner claims the jury received ambiguous or contradictory instructions regarding the intent element of burglary because they were instructed he needed specific intent to commit assault, theft, or make criminal threats when he entered room 118, but were instructed assault did not require specific intent to injure or even use force against someone. (ECF No. 1 at 32–35.) He argues the jury may have found that by flailing about and kicking the door Petitioner engaged in actions which might satisfy the elements of assault even though he did not intend to hurt anyone or enter the room with such intent, permitting conviction on count one without establishing the intent element of burglary beyond a reasonable doubt in violation of the Fourteenth Amendment. (*Id*.) He contends it was likely the jury based the burglary conviction on his entering the room with the intent to commit assault since there was no evidence of theft and they could not agree on whether he made criminal threats, and that the instructions could have allowed him to be convicted of burglary even if the jury believed him that he was not trying to hurt anyone but only

summon help, eliminating his only defense.  (*Id.*)

Respondent answers that to the extent this claim relies on an error of state law it is not cognizable, and to the extent it presents a federal claim the state court adjudication is neither contrary to, nor an unreasonable application of, clearly established federal law. (ECF No. 9-1 at 22–28.)

The last reasoned state court opinion is by the appellate court, which stated:

Vasquez contends the trial court's instructions regarding the specific intent required to commit burglary, which were correct on their face, may have confused the jury insofar as the entry was based on his intent to commit the target crime of assault, which the court correctly instructed was a general intent crime.  Vasquez acknowledges each instruction correctly stated the law as to the intent required for the different offenses, but asserts "ambiguity was introduced" because burglary was a specific intent crime while assault by means of force likely to produce great bodily injury was a general intent crime.

a.  *Background Facts*

The trial court instructed the jury that the crime of burglary required specific intent, explaining that burglary "as charged in count() 1 . . . require(s) what is called a specific intent or mental state.  For you to find a person guilty of (burglary), that person must not only intentionally commit the prohibited act, but he must do so with a specific intent.  And the act and specific intent required will be explained in the instructions for those crimes."  The court, instructing specifically on the elements of burglary, explained that the prosecution had to prove beyond a reasonable doubt that Vasquez entered a building and, "when he entered . . . he intended to commit theft or assault with force likely to produce great bodily injury or to make criminal threats.  (¶) To decide whether the defendant intended to commit theft or assault with force likely to produce great bodily injury or to make criminal threats, please refer to the separate instructions I'm going to give you that will define the elements of those crimes.  (¶) . . . (¶)  A burglary was committed if the defendant entered with the intent to commit theft or assault with force likely to produce great bodily injury or to make criminal threats as long as he entered with intent to do so.  The People do not have to prove that defendant actually committed theft or assault with force likely to produce great bodily injury or made criminal threats."  The instruction cautioned that the jury could not find Vasquez guilty of burglary "unless you all agree that he intended to commit

one of those crimes at the time of entry to the building (but) (y)ou do not all have to agree on which one of those crimes he intended."

The court then explained that it had "identified what we call the target offenses that the defendant had to intend to commit when he entered. Let me define those offenses." It went on to instruct on the various target offenses, including the assault offense: "The following are the definitions of the elements of assault with force likely to produce great bodily injury. (¶) 1A, a defendant does an act that by its nature would directly and probably result in the application of force to a person; (¶) 1B, the force used was likely to produce great bodily injury; (¶) 2, the defendant does the act willfully; (¶) 3, when a defendant acted, he was aware of facts that would lead a reasonable person to believe that his act by its nature would directly and probably result in the application of force to someone; (¶) and, 4, when defendant acts, he has the present ability to apply force likely to produce great bodily injury to a person. (¶) Someone commits an act willfully when he or she does it willingly or on purpose. It's not required that he or she intend to break the law, hurt someone else, or gain any advantage." Finally, the court instructed that a "burglary in this case was committed if the defendant entered with intent to commit theft or assault with force likely to produce great bodily injury or to make criminal threats. The defendant does not need to have actually committed theft or assault with force likely to produce great bodily injury or made criminal threats as long as he entered with intent to do so. The People do not have to prove the defendant actually committed theft or assault with force likely to produce great bodily injury or made criminal threats." [¶] Vasquez did not object to the court's instructions or request clarifying language.

>    *b. Analysis*

A trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 866.) When a defendant is charged with burglary, a court should instruct on the elements of the offenses underlying a burglary charge because the failure to instruct on the underlying offenses might "allow() the triers of fact to indulge in unguided speculation as to what kinds of criminal conduct are serious enough to warrant punishment as felonies and incorporation into the burglary statute." (*People v. Failla* (1966) 64 Cal.2d 560, 564; *People v. Rathert* (2000) 24 Cal.4th 200, 204 ("In a burglary prosecution, complete and accurate jury instructions include the definition of each felony the defendant is alleged to have intended to commit upon entry into the burglarized structure.").)

An appellate court independently reviews the correctness and adequacy of a trial court's instructions, examining "whether the trial court 'fully and fairly instructed on the applicable law.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  We consider the instructions as a whole and presume the jurors are intelligent persons, capable of understanding and correlating the instructions given.  (*Ibid.*)  The instructions "'should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*Ibid.*)  "Once the trial court adequately instructs the jury on the law, it has no duty to give clarifying or amplifying instructions absent a request." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331.)

Vasquez contends the instructions "muddied the waters," and suggests that the specific intent required for burglary was somehow excused by the general intent language contained in the assault instruction.  We disagree.  The burglary instruction specified that the crimes charged required the "union . . . of act and wrongful intent," that burglary "require(s) what is called a specific intent," and that the jury could only find Vasquez guilty if he intentionally committed the prohibited act and did so with a specific intent.  Instructing specifically on the elements of burglary, the court explained that the prosecution had to prove beyond a reasonable doubt Vasquez committed the actus reas accompanied by the attendant mens rea (i.e., a specific intent to commit one of three underlying offenses), but that there was no requirement he actually committed any of three underlying offenses.  There was nothing in the standard instructions given by the court from which jurors, as intelligent persons capable of understanding and correlating the instructions given (*People v. Ramos, supra*, 163 Cal.App.4th at p. 1088), would understand they could convict Vasquez of burglary without finding he specifically intended to commit a further qualifying offense when he entered the room.

Moreover, any theoretical possibility of ambiguity was mitigated by the prosecutor's argument.  In his closing, the prosecutor emphasized that the critical inquiry facing the jury was whether Vasquez had the requisite *specific* intent (to commit an underlying offense) *when* he entered, and that whether he ultimately committed *additional* acts constituting the underlying offense (for which instructions as to Vasquez's *general* intent might become relevant) was not germane to their assessment of his guilt of burglary.*  (See, e.g., *People v. Garceau* (1993) 6 Cal.4th 140, 189 ("Viewed singularly or collectively, the standard instructions given by the trial court were not confusing.  Moreover, any theoretical possibility of confusion was diminished

by the parties' closing arguments."), disapproved on other grounds by *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

> *Footnote: The prosecutor argued: "The important thing to remember when you look at this instruction, just to avoid any confusion, is that the charge in this case is burglary. The charge in this case is in the title. It's burglary. We're talking about burglary, whether he had the intent to commit those crimes. The trio: theft, assault, threats. (¶) Okay. So it's important to note that when you are looking at those instructions, you might say, well, he didn't cause any assaults with any great bodily injury at all. Remember, the charge-he's not charged with assault. He's charged with burglary. The defendant does not need to have actually committed the trio (of) theft, assault or threats, *as long as he entered the building with the intent to commit one of those offenses*. So . . . you're not looking for the completion of one of those offenses at this point. You're just looking at what was his intent when he entered that building that night."

We are unpersuaded by Vasquez's attempt to analogize the instructions given here to the instructional defect addressed by the courts in *People v. Beck* (2005) 126 Cal.App.4th 518 and *People v. Jeter* (2005) 125 Cal.App.4th 1212 (*Jeter*). In *Beck*, the defendant was charged with attempted murder and the court instructed that attempted murder required the defendant to have committed the actus reus while "'harbor(ing) express malice aforethought, namely, a specific intent to kill unlawfully another human being,'" which the *Beck* court concluded expressed with "sufficient clarity the requirement that attempted murder requires the specific intent to kill." (*Beck*, at p. 522.) However, immediately after giving the correct attempted murder instruction, the *Beck* court noted the trial court's instructions had then "reintroduce(ed) the concept of implied malice and inform(ed) the jury that either express or implied malice would 'establish the mental state of malice aforethought.'" (*Id*. at pp. 522–523.) The prosecutor exacerbated the problem by arguing implied malice was sufficient to find attempted murder. (*Id*. at pp. 523, 525.) The *Beck* court concluded the instructional error required reversal because the jury, once it concluded the defendant committed the requisite act, could have concluded he was guilty even if the requisite act was unaccompanied by the specific intent required for attempted murder. (*Id*. at p. 525.)

Similarly, in *Jeter*, this court first concluded that a charged violation of Penal Code section 4500, assault by a life prisoner, requires the same type of mental

state as murder, i.e. malice aforethought.  (*Jeter, supra*, 125 Cal.App.4th at p. 1216.)  Although the jury in *Jeter* was correctly instructed on what constituted malice aforethought, it was also instructed on the elements and concepts relating to assault using CALJIC 9.00 (which specified "'an assault does not require an intent to cause injury to another person, or an actual awareness of the risk that injury might occur to another person'"), and was also given the simple malice instruction permitting a finding of malice if there is a "'wish to vex, . . . annoy or injure another person, or an intent to do a wrongful act.'" (*Jeter*, at pp. 1216-1217.)   This court concluded the jury was given irreconcilably conflicting instructions, some of which required the jury to find the actus reus was accompanied only by general intent, but others requiring the jury to find the actus reus was accompanied by the specific intent of malice aforethought, and reversal was required because it was impossible to tell which standard was applied by the jury.  (*Id*. at pp. 1217–1218.)

Unlike *Beck* and *Jeter*, the jury here was not instructed Vasquez could be found guilty if, at the time he committed the actus reus for burglary (the entry into the room), he had either the specific intent to commit an underlying offense or merely the general intent to commit the wrongful act of entering. Instead, the jury was instructed, and the prosecutor's argument confirmed, that it could only find Vasquez guilty if at the time he entered he had the specific intent to commit additional distinct criminal offenses.  The mere fact the court also explained that Vasquez, after entering, could have committed one of those additional criminal offenses without harboring a specific intent did not "excuse" the jury from determining, as the court instructed, whether he possessed the requisite specific intent to commit those additional criminal offenses when he entered the room, as would be necessary to find him guilty of the burglary count.

(Lodgment No. 15, *People v. Vasquez*, No. D070638, order at 23–29.)

In order to be entitled to federal habeas relief based on allegedly defective jury instructions, Petitioner must demonstrate the instructions "so infected the entire trial that the resulting conviction violates due process."  *McGuire*, 502 U.S. at 72.  "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

The prosecutor reminded the jury during closing argument they had to unanimously agree Petitioner had the intent to commit theft, assault, or make criminal threats when he

entered the motel room in order to be guilty of burglary, and that he did not have to actually commit any of those offenses and was not on trial for assault.  (RT at 714.)  During closing argument defense counsel conceded the elements of vandalism were met, but repeatedly reminded the jury that Petitioner had to have formed the intent to commit theft, assault, or make a criminal threat before entering the motel room.  (*Id.* at 724–29.)

The jury had been deliberating for about an hour when they sent a note asking: "For burglary; Theft, assault, and criminal threats, do all elements, 1-2-3 and 4 need to apply or can 1 and 2 and 4 apply, but not 3?"  (CT at 225.)  They were referring to their instruction:

> Defendant is charged in count 1 with burglary, which requires an intent to commit theft or assault with force likely to produce great bodily injury or make criminal threats.  The following are the elements of the theft:
>
> 1, a defendant takes possession of property owned by someone else;
>
> 2, the defendant takes the property without the owner's consent;
>
> 3, when defendant takes the property he intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property;
>
> and, 4, the defendant moves the property even a small distance and keeps it for any period of time, however brief.

(RT at 695–96.)

The trial judge's response to the jury's note stated:

> For burglary based on an intent to commit theft, defendant needs to enter the building with the intent to commit theft, but does not have to actually commit theft.  The jury instruction entitled "Burglary: Theft, Assault, and Criminal Threats" defines the elements of the crime of theft; to be guilty of burglary based on an intent to commit theft, defendant must have intended to do all the acts identified in Elements 1-4 or the instructions.

(CT at 225.)

///

The jury deliberated another 40 minutes after receiving that response and were excused for the day.  (*Id*.)  The next day they began deliberating at 9:00 a.m., had the testimony of Kim Schildmeyer read back from 11:10 a.m. to 12:20 p.m., took an hour for lunch, and deliberated again from 1:30 p.m. to 2:22 p.m., at which time they sent a note stating they had reached verdicts on the burglary and vandalism counts but could not reach a verdict on count two, making criminal threats.  (*Id*.)  During an inquiry on whether further deliberations might be useful, one juror said they had been deliberating only on count two that entire day.  (RT at 780–81.)

The record supports a finding the jury was told at least five times that burglary required proof Petitioner entered the motel room with the intent to commit an assault, theft, or make criminal threats, and reached their verdict on count one shortly after they received the answer to their question whether all four elements of theft had to be shown.  It appears from their note they were determining whether Petitioner intended to permanently deprive the occupants of room 118 of their cell phone or remove it from their possession for such an extended a period of time they would be deprived of a major portion of the value or enjoyment of it.  That supports Petitioner's contention they rested their burglary verdict on a finding he entered the room with the intent to assault the occupants, as they were unable to decide whether he made criminal threats, and the evidence did not seem to satisfy the third element of theft.  However, it was objectively reasonable for the state court to find that any theoretical ambiguity or potential confusion between the need to have the specific intent to commit assault when entering the motel room and the instruction that assault required only general intent was cured by repeated instructions and repeated argument of counsel that Petitioner had to form the intent to commit assault prior to entering the room. *See Cupp*, 414 U.S. at 148–49 ("[I]nstructions bearing on the burden of proof, just as those bearing on the weight to be accorded different types of testimony and other familiar subjects of jury instructions, are in one way or another designed to get the jury off dead center and to give it some guidance by which to evaluate the frequently confusing and conflicting testimony which it has heard.  The well-recognized and long-established

function of the trial judge to assist the jury by such instructions is not emasculated by such abstract and conjectural emanations from [petitioner].")  There is no support in the record for Petitioner's contention the jury was confused by their instructions.

When "considered in the context of the instructions as a whole and the trial record," it is clear Petitioner has not demonstrated the challenged instructions "so infected the entire trial that the resulting conviction violates due process."  *McGuire*, 502 U.S. at 72; *see also Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (holding that federal habeas functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).  Accordingly, federal habeas relief is unavailable as to claim three because the state court adjudication is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

## IV.   Claim Four

Petitioner alleges the prosecutor committed misconduct during rebuttal closing argument in violation of federal law by arguing facts not in evidence and mischaracterizing the law regarding his prior convictions.  (ECF No. 1 at 35–36 (citing *Berger v. United States*, 295 U.S. 78, 88 (1935) (reversing conviction based on prosecutorial misconduct during closing argument).)  He argues the prosecutor referred to facts not in evidence by saying Petitioner held "a gun to them," referring to Tina Black and her 10-year-old daughter who were home when he burglarized their house, mentioned the daughter's name, and implied Tina Black was not a drug dealer.  (*Id.*)  He also argues the prosecutor mischaracterized the evidence of the prior convictions by arguing Petitioner was a "mean" and "evil" person for robbing a mother and young daughter, constituting an improper use of the prior crimes to attack his character.  (*Id.*)  Petitioner also claims he received ineffective assistance of counsel in violation of the Sixth Amendment by defense counsel's failure to object to the prosecutor's improper argument.  (*Id.* at 36–37.)

Respondent argues the prosecutorial misconduct aspect of this claim is procedurally defaulted due to the failure of defense counsel to object, and it is in any case not cognizable because it alleges an error of state law only.  (ECF No. 9-1 at 28-34.)  Respondent argues that the state court adjudication of the ineffective assistance of counsel aspect of this claim is neither contrary to, nor an unreasonable application of, clearly established federal law.  (*Id*. at 34–42.)  The appellate court denied these claims on direct appeal, stating:

> Vasquez finally contends he was deprived of effective assistance of counsel because his attorney did not object when the prosecutor allegedly committed misconduct during closing argument (by referring to facts not in evidence and by mischaracterizing the law), and there is a reasonable probability that but for his counsel's failings the result of the proceeding would have been different.

> During rebuttal argument, the prosecutor made three statements that Vasquez claims mischaracterized the law and adverted to facts not in evidence.  All of the purported "improper" references concern his 2002 guilty plea to a charge of burglary in which he admitted that he personally used a firearm.  As previously noted, Vasquez testified that the 2002 conviction occurred because, while armed with a gun, he "(w)ent into a house to rob some drug dealers and got in trouble."  Vasquez complains about the prosecutor's statement:

>> "Why would somebody do it?  Why would somebody go into a woman's home with her 10-year-old daughter and hold a gun to them and then blame them for being drug dealers?  Got to be high.  Got to be out of your mind to treat somebody like that.  Sometimes the answer is people are just flat mean.  Sometimes people . . . just straight-out, flat-out have evil intentions.  Evil intentions.  Period."

> He also complains the prosecutor later mentioned the daughter by name.

> On appeal, Vasquez contends this statement by the prosecutor "mischaracterized the law" by implying the jury could consider his character when assessing his guilt in this proceeding.  Vasquez also asserts there were no facts supporting the express statement that he "held a gun to them" or the reference to the daughter's name, and no evidence supporting the "implied" statement the mother was not actually a drug dealer.

*a. Applicable Law*

"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'" ((Quoting *People v. Gionis* (1995) 9 Cal.4th 1196, 1214.)) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" ((Quoting *People v. Espinoza* (1992) 3 Cal.4th 806, 820.))" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

"(P)rosecutors have wide latitude to draw inferences from the evidence presented at trial, (but) mischaracterizing the evidence is misconduct. (Citations.) . . . (However,) the line between permissible and impermissible argument may sometimes appear unclear . . . ." (*People v. Hill* (1998) 17 Cal.4th 800, 823.) A prosecutor can also commit misconduct if he or she misstates the applicable law. (*People v. Boyette* (2002) 29 Cal.4th 381, 435.)

Vasquez concedes his counsel did not object to any of the claimed factual inaccuracies or the purported mischaracterization of the law, and a defendant ordinarily forfeits appellate review of claims of prosecutorial misconduct absent a timely and specific objection and request for an admonition or curative instruction.* (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.) "Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Ibid*.) Vasquez urges, however, that we may reach the claims because the failure to object deprived him of effective assistance of counsel.

> *Footnote: We recognize this "is only the general rule" (*People v. Hill, supra*, 17 Cal.4th at p. 820), and we may excuse the necessity of either a timely objection and/or a request for curative admonition if either would be futile, or if an admonition would not have cured the harm caused by the specified misconduct. (*Ibid*.) However, Vasquez does not suggest on appeal that either exception applies here.

"To establish a claim of ineffective assistance of trial counsel, a defendant must show by a preponderance of the evidence that the attorney's performance fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's conduct, the result of the proceeding would have been different." (*People v. Mincey* (1992) 2 Cal.4th 408, 449.) On the first component of whether counsel's performance was deficient, "we exercise deferential scrutiny. (Citations.) The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.) "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel (citation), and there is a 'strong presumption that counsel's conduct falls within the wide range of professional assistance.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) The deference we accord to counsel's tactical decisions means courts "should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) Because Vasquez's claim here is based on the failure to object, we must also be cognizant that "(a)n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel" (*People v. Kelly* (1992) 1 Cal.4th 495, 540), including failing to object to a prosecutor's closing argument. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 221-224.)

On the second prong, a defendant must establish prejudice and, generally, the defendant must affirmatively prove prejudice by showing the reasonable probability that but for counsel's unprofessional error, the result of the proceeding would have differed. A reasonable probability is one sufficient to undermine confidence in the outcome. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) "(T)his second prong . . . is not solely one of outcome determination. Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" (*In re Harris* (1993) 5 Cal.4th 813, 833.)

### b. Alleged Misstatements of Law

Against these standards, Vasquez has not shown that his counsel's failure to object to the identified claims of misconduct deprived him of effective assistance of counsel. He claims the statement mischaracterized the law by inviting the jurors to consider his character for having "evil intentions" and being "mean" in deciding whether he committed the instant crimes, which is

the precise use for which prior crimes is improper under section 1101, subdivision (a).  Viewing the statements in the context of the argument as a whole (see *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21 (when assessing claims of prosecutor misconduct during closing argument "'arguments of counsel . . . must be judged in the context in which they are made'")), we do not believe there is a reasonable likelihood the jury understood the prosecutor's argument (cf. *People v. Lucas, supra*, 12 Cal.4th at p. 475) to suggest that the jury should consider Vasquez's character for having "evil intentions" and being "mean" in deciding whether he committed the charged offense because of his propensity to commit crimes, which is the purpose that section 1101, subdivision (a), proscribes.  (See generally *People v. Villatoro* (2012) 54 Cal.4th 1152, 1170-1171 (conc. & dis. opn. of Corrigan, J.).)  To prove an evil intent - the intent to steal - was precisely why the prior offenses were admissible.  Moreover, the comments in rebuttal merely noted that the defense appeared to argue Vasquez's conduct was explicable because he was in fact intoxicated, and the prosecutor was urging the jury not to be misled into assuming intoxication was the only factual explanation that made Vasquez's conduct understandable.\*\*  Accordingly, Vasquez's counsel was not ineffective in failing to object that the prosecutor's argument mischaracterized the law.

> \*\*Footnote: The prosecutor's argument, in context, was that: "It's human nature to want answers, to want an explanation when people do awful, terrible, unspeakable things to other people.  It's natural that we want some kind of explanation.  We want some kind of answer why did he do it. Was he high? Was he crazy? There's got to be some explanation.  Why did he do it?  You look for those things.  And you open up the paper and you read the stories there.  There is all kinds of crazy things reported there. You ask yourself how could somebody rob a little old lady at the ATM.  Why would somebody do that.  Why would somebody do such a mean thing to somebody else.  Must have been high.  Must have been out of his mind.  Must have been crazy to do such a thing.  Sometimes you forget there isn't always an answer like that.  But sometimes, and most of the time, the answer is simple.  Some people are just flat mean.  Bottom line.  (¶)  Why would somebody do it?  Why would somebody go into a woman's home with her 10-year-old daughter and hold a gun to them and then blame them for being drug dealers?  Got to be high.  Got to be out of your mind to treat somebody like that.  Sometimes the answer is people are just flat mean. Sometimes people . . . just

> straight-out, flat-out have evil intentions.    Evil intentions.
> Period."

Even assuming the prosecutor's argument could have been construed as mischaracterizing the law, we are unconvinced Vasquez is entitled to reversal for ineffective assistance of counsel because it is not reasonably probable the result of the proceeding would have differed had counsel objected.  (Cf. *People v. Barnett* (1998) 17 Cal.4th 1044, 1177.)  Had there been a timely objection, Vasquez does not suggest that the court's remedy - to give a curative admonition reminding the jury of the proper purpose to which the evidence could be considered - would not have sufficed to remedy any perceived harm.  (Cf. *People v. Tate* (2010) 49 Cal.4th 635, 693 (curative admonition was adequate to cure harm from misconduct); *People v. Bell* (1989) 49 Cal.3d 502, 538 (alleged misconduct waived because "(h)ad counsel believed the jury might misunderstand the prosecutor's meaning, . . . the misleading aspect of the argument . . . could have been cured by admonition); *People v. Clark* (2011) 52 Cal.4th 856, 960 (failure to object and request admonition excused only where admonition would not cure the harm).)  Indeed, the substance of the curative admonition the jury would have received had Vasquez's counsel timely objected was given to them by the prosecutor himself when he later argued:

> "The last thing I think you ought to consider when you're determining voluntary intoxication and his intent for these crimes is you ought to consider his priors.  You've got to consider his priors.  And the judge gave you a very specific instruction on how to use that information.  And I want to address that briefly.  (¶) . . .  (¶) . . . according to this instruction, you can't use this information to say he's a bad guy.  You can't do that.  You can't use this information to conclude that he has a bad character, is (dis)posed to commit crimes.  The instruction is very clear on that.  (¶)  But what can you do, the instruction goes on to say: you may, but you don't have to, but you may consider that evidence for this limited purpose to determine whether or not the defendant acted in this case with intent to do that trio of crimes for the burglary count.  You can use the evidence of his priors for this limited purpose."

Because we are unconvinced it is reasonably probable the result of the proceeding would have been more favorable had the court given the same curative admonition given by the prosecutor, we reject Vasquez's ineffective

assistance of counsel claim insofar as it is based on the failure to object to the alleged mischaracterization of the law.

### c. Alleged Reference to Facts Not in Evidence

Vasquez alternatively claims there was misconduct in the prosecutor's reference to facts not in evidence.  However, the first example he cites - the prosecutor's statement Vasquez entered Black's home and "(held) a gun to them" - had evidentiary support in Vasquez's own testimony he entered the home with a gun to "rob some drug dealers."  The fact he entered the home with a gun to effectuate the robbery permits the inference he employed the tool he brought with him, and it is not misconduct to argue "an inference fairly supported by (the) testimony." (*People v. Padilla* (1995) 11 Cal.4th 891, 941, disapproved on other grounds by *People v. Hill, supra*, 17 Cal.4th at p. 823, fn. 1.)  Because the statement was not misconduct, counsel was not ineffective in failing to object.

Vasquez's second assertion - that his counsel should have objected to the prosecutor's implication the mother was not a drug dealer - is even less meritorious, because the statement cannot reasonably be read to convey that implication.  We do not read the statement as suggesting the victim was not in fact a drug dealer; rather, the prosecutor sought to characterize Vasquez's testimony that the victim was a drug dealer as (in the prosecutor's view) an effort to minimize Vasquez's culpability by gratuitously besmirching the victim.

Vasquez's final claim - the mention of the daughter's first name - was a reference to a fact not in evidence that transgressed the limitations on proper argument by the prosecutor, but we are unpersuaded the failure to object shows Vasquez was deprived of effective assistance of counsel.  This reference was so de minimus that there is no reasonable probability the result of the proceeding would have been different had his counsel objected.

For all the foregoing reasons, we conclude Vasquez's claims of prosecutorial misconduct are without merit, he has not properly preserved those claims, and/or he is not entitled to reversal based on alleged ineffective assistance of his counsel in failing to preserve such claims.

(Lodgment No. 15, *People v. Vasquez*, No. D070638, order at 29–37.)

///

///

### A.    Prosecutorial misconduct

Respondent argues the prosecutorial misconduct aspect of this claim is procedurally defaulted because it was not preserved on appeal due to a failure to object at trial.  In order to preclude federal habeas review based on a procedural default, a state procedural bar must rest on a state ground which is "independent" of federal law and "adequate" to forever bar federal review.  *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).  To be "independent" the state law basis for the decision must not be interwoven with federal law.  *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983).  In order to be "adequate," the state procedural bar must be "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. Bean*, 96 F.3d 1126, 1129 (9th Cir. 1996).  Where a state court also reaches the merits in the alternative to imposing a procedural bar, it does not preclude a procedural default in this Court.  *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (holding that "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision" the fact that the state court also reached the merits of the claims does not prevent the claims from being procedurally defaulted).

Respondent has the initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review.  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  If Respondent is successful, the burden shifts to Petitioner to challenge the independence or adequacy of the procedural bar.  *Id.*

Respondent has carried the initial burden by identifying the contemporaneous objection rule as precluding federal review of this claim.  *See Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999) (holding that California's contemporaneous objection rule supports a procedural default in a federal habeas proceeding).  Petitioner has made no effort to satisfy his burden of challenging the independence or adequacy of the procedural bar, and this aspect of claim four is procedurally defaulted.  *Bennett*, 322 F.3d at 586.

The Court can address the merits of a procedurally defaulted claim if Petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or that a fundamental miscarriage of justice would result from the Court

18-CV-2900 JLS (MSB)

not reaching the merits of the defaulted claim. *Coleman*, 501 U.S. at 750. Petitioner alleges his trial counsel was ineffective in failing to object, which, if true, could establish cause and prejudice to excuse the default. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State.") Petitioner has not shown cause and prejudice, however, because, as set forth below, he has not established constitutionally ineffective assistance of trial counsel. In addition, as evident throughout this Order, a fundamental miscarriage of justice would not result from a default. *See Schlup*, 513 U.S. at 316 (holding that a showing of fundamental unfairness needed to overcome a procedural default requires a presentation of "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial").

Accordingly, the Court denies habeas relief on the prosecutorial misconduct aspect of claim four on the basis it is procedurally defaulted.[3]

### B.     *Ineffective assistance of counsel*

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He must also show counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Id*. To show prejudice, Petitioner need only demonstrate "a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

---

[3] Even if the Court to reach the merits of the prosecutorial misconduct aspect of claim four, it would fail on the merits. Clearly established federal law provides that in order "to constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). As discussed in the ineffective assistance aspect of this claim, the prosecutor's alleged misconduct clearly did not rise to that level.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. The standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Defense counsel argued in closing that Petitioner's actions were not criminal because he had been using methamphetamine for several days without sleep, which Dr. Smith said could prevent him from forming the necessary intent due to paranoid delusions triggered by threats from former gang members or his girlfriend, which was consistent with Kim Schildmeyer's testimony he did not seem to hear her or process what she was saying. (RT at 741–44.) Defense counsel also pointed out that Dr. Smith had not been called to evaluate Petitioner, merely to interpret his symptoms and behavior, and said:

> The prosecution would like you to believe that all of this behavior is because Mr. Vasquez is just an irrational, crazy person who is going after these people because he has some kind of vendetta against them even though he's never met them, and that is just not the case. It is very clear he was under the influence and that there was something else affecting the way that he was perceiving and processing and responding to this external stimuli.

(*Id.* at 741–42.)

Petitioner contends defense counsel should have objected when the prosecutor argued in rebuttal:

> I suppose the defense is hanging their hat on the voluntary intoxication instruction. And so I think it's important to cover that. I get to respond to things in rebuttal. I think it's important to cover that. Because the fact of the matter is it's human instinct. It's human nature to want answers, to want an explanation when people do awful, terrible, unspeakable things to other people. It's natural that we want some kind of explanation. We want some kind of answer why did he do it. Was he high? Was he crazy? There's got to be some explanation. Why did he do it? You look for those things. And you open up the paper and you read the stories there. There is all kinds of crazy things reported there. You ask yourself how could somebody rob a little old lady at the ATM. Why would somebody do that. Why would somebody

48

18-CV-2900 JLS (MSB)

do such a mean thing to somebody else.  Must have been high.  Must have been out of his mind.  Must have been crazy to do such a thing.  Sometimes you forget there isn't always an answer like that.  But sometimes, and most of the time, the answer is simple.  Some people are just flat mean.  Bottom line.

Why would somebody do it?  Why would somebody go into a woman's home with her 10-year-old daughter and hold a gun to them and then blame them for being drug dealers?  Got to be high.  Got to be out of your mind to treat somebody like that.  Sometimes the answer is people are just flat mean.  Sometimes people are just straight-out, flat-out have evil intentions.  Evil intentions.  Period.

(*Id.* at 747–48.)

The appellate court correctly found it was not reasonably likely the jury would have understood the prosecutor's statement as arguing Petitioner's prior convictions show he is a mean and evil person for holding a gun to the head of a mother and young daughter, and thereby attacking his character.  Rather, that court correctly found it was more likely the jury understood it was being used to show he entered the motel room with evil intent, or that there was another explanation for his behavior other than intoxication, which were proper uses of the prior convictions.  In fact, the failure to object may well have been a tactical decision not to draw further attention to the prior convictions, particularly since the prosecutor cured any possible misrepresentation by repeatedly arguing, as set forth immediately below, that the jury was not permitted to use the priors for any purpose other than to establish Petitioner's intent when he entered the motel room.  *See Burt v. Titlow*, 571 U.S. 12, 23 (2013) ("It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct (fell) within the wide range of reasonable professional assistance.'") (quoting *Strickland*, 466 U.S. at 689); *see also Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (recognizing a strong presumption counsel took actions "for tactical reasons rather than through sheer neglect") (citing *Strickland*, 466 U.S. at 690) (holding that counsel is "strongly presumed" to make decisions in the exercise of professional judgment); *Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys

would not defend a particular client in the same way.").  The state court adjudication of the *Strickland* performance prong is objectively reasonable.  *Id.* at 687 (holding that deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment").

The state court also correctly found that even if defense counsel should have objected there was no prejudice because any curative instruction would have been the equivalent of the prosecutor's later statements.  The prosecutor concluded a lengthy segment of his argument that the jury should reject the voluntary intoxication defense by stating:

> And the last thing you ought to consider when you're determining voluntary intoxication and his intent for these crimes is you ought to consider his priors. You've got to consider his priors.  And the judge gave you a very specific instruction on how to use that information.  And I want to address that briefly.

> Instruction says "the People presented this evidence that he entered Tina Black's home and --" incident that is Tina Black and Haylee Black.  Haylee is the 10-year-old-daughter.  The drug dealers.  "That he entered their home in 2002 to steal property or commit a felony.  And that the defendant entered Lucy Aloyiam's home in 2000 to steal property or commit a felony."  He did those crimes.  There is some talk in the instruction about proving that beyond a reasonable doubt or by preponderance of the evidence.  He did those crimes. He was asked questions about them.  He admitted those crimes.

> So the question is what do you do with the information.  And according to this instruction, you can't use this information to say he's a bad guy.  You can't do that.  You can't use this information to conclude that he has a bad character, is exposed [sic] to commit crimes.  The instruction in very clear on that.

> But what you can do, the instruction goes on to say: You may, but you don't have to, but you may consider that evidence for this limited purpose to determine whether or not the defendant acted in this case with intent to do that trio of crimes for the burglary count.  You can use the evidence of his priors for this limited purpose.

> So you can take the fact that he entered Tina Black's home in 2002, Lucy Aloyiam's home in 2000 to commit theft or commit a felony in those homes. You cannot conclude that he's a bad guy or that he is probably good for whatever crime he is charged with today.  You can't conclude that.  But you

18-CV-2900 JLS (MSB)

> can -- under the law, you can conclude that history tells us that when he enters somebody else's home he intends to steal or commit a felony.  You can absolutely do that.  And you should consider that.

(RT at 758–59.)

Petitioner was not prejudiced by his counsel's failure to object because, taken in context, the prosecutor's remarks were not a mischaracterization or misuse of the prior convictions to attack his character.  If fact, the prosecutor made the opposite point, that the jury was not permitted to use the prior convictions for that purpose.  His statement asking: "Why would somebody go into a woman's home with her 10-year-old daughter and hold a gun to them and then blame them for being drug dealers?" was, as the state court correctly observed, based on a reasonable inference drawn from Petitioner's own testimony that: (1) he was armed with a gun when he robbed them, (2) that the woman was a drug dealer, and (3) he only did it for the money.  *See Ceja*, 97 F.3d at 1253 (recognizing prosecutors are permitted to argue reasonable inferences from evidence presented at trial).

In addition to the prosecutor's reminder to the jury not to use the prior convictions for an improper purpose, the jury was instructed:

> Now, as to the burglary, the People have presented evidence that the defendant entered Tina Black's home in 2002 to steal property or commit a felony and that the defendant also entered Lucy Aloyiam's home in 2000 to steal property or commit a felony.
>
> You may consider this evidence only if the People have proven by preponderance of the evidence that the defendant did, in fact, commit those uncharged acts.  Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt.  A fact is proven by a preponderance of the evidence if you conclude that it's more likely than not that that fact is true.
>
> If the People have not met this burden, you must disregard this evidence entirely.
>
> If you decide the defendant did commit those uncharged acts, you may, but are not required to, consider that evidence for the limited purpose of deciding

whether or not the defendant acted in this case with the intent to commit theft or assault with force likely to produce great bodily injury or to make criminal threats during the burglary charged in count 1.

In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and this charged offense.

Do not consider this evidence for any other purpose.

Do not conclude from this evidence that the defendant has a bad character or is disposed to commit such crimes.

If you conclude that the defendant committed the uncharged acts, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of burglary.  The People must still prove each charge and allegation beyond a reasonable doubt.

(RT at 699.)

The Court presumes jurors understand and follow the instructions they are given. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  That presumption can be overcome where there is "a strong likelihood that the effect of the [error] would be devastating to the defendant."  *Greer*, 483 U.S. at 766 n.8 (1987).  That presumption has not been rebutted, and in fact is strengthened by the prosecutor's argument, which closely mirrored the jury instructions.  Accordingly, the state court determination, that Petitioner was not prejudiced by his counsel's failure to object because the jury was not reasonably likely to misconstrue to the prosecutor's argument as an invitation to use the prior convictions for an improper purpose, is objectively reasonable because the failure to object does not "undermine confidence in the outcome" of the trial.  *Strickland*, 466 U.S. at 694.

The finding by the appellate court that the failure to object to the prosecutor's saying the name of the Tina Black's ten-year-old girl daughter during closing arguments, which Petitioner is correct was not in evidence, was *de minimis* and therefore insufficiently egregious to show ineffective assistance, is consistent with clearly established federal law. *See Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-

assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."); *Strickland*, 466 U.S. at 687 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial.").

Accordingly, federal habeas relief is unavailable as to claim four because the prosecutorial misconduct aspect of the claim is procedurally defaulted, and the state court adjudication of the ineffective assistance of counsel aspect is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

## V.    **Claim Five**

In his final claim, Petitioner alleges the cumulative impact of all the foregoing errors resulted in a fundamentally unfair trial.  (ECF No. 1 at 37–38.)  He argues that the cumulation of the errors, including the introduction of details of his prior convictions, which falsely suggested he had the same intent in those crimes as he did here and which the prosecutor used to bolster the weakness of his case by improperly using them to imply Petitioner was a mean and evil person; the improper cross-examination of Dr. Smith to suggest his opinion was not credible; and the instructional error lowering or obfuscating the level of intent the jury was required to find, fatally crippled his defense and unfairly bolstered the prosecution's case.  (*Id.*)

Respondent answers that: (1) to the extent the claim relies on state errors only it is not cognizable on federal habeas; (2) to the extent it relies on federal law, there is a split in the Circuit courts whether cumulative error constitutes "clearly established federal law" under AEDPA, and because the Supreme Court has not resolved that split, Petitioner cannot obtain relief because there is no clearly established federal law within the meaning of AEDPA; (3) although the state appellate court did not mention this claim in its order on direct appeal, this Court should presume it was denied on the merits in state court and apply

AEDPA to the appellate court opinion; and (4) the appellate court adjudication, which should be read as denying the claim on the basis there were no errors to accumulate, is neither contrary to, nor an unreasonable application of, clearly established federal law. (ECF No. 9-1 at 42–45.)

Petitioner raised this claim as a federal claim on direct appeal in both the state appellate and supreme courts (Lodgment No. 16 at 45–49; Lodgment No. 12 at 78–81), but neither court mentioned it or directly addressed it.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Richter*, 562 U.S. at 99 (citing *Reed*, 489 U.S. at 265) (holding that there is a presumption the state court reached the merits of a federal claim even when it is unclear whether the decision appeared to rest on federal grounds or was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  *Id*. at 99–100.  There is no basis in the record to rebut the presumption that both state courts reached the merits of this federal claim.  *Id.*; *see also Killian v. Poole*, 282 F.3d 1204, 1207–08 (9th Cir. 2002) (holding that AEDPA deference does not apply to claims presented in state court only where "no adjudication on the merits in state court was possible").

A federal habeas court independently reviews the record when the state court reaches a decision on the merits but provides no reasoning to support its conclusion.  *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir. 2003).  Petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  *Richter*, 562 U.S. at 98.

The Ninth Circuit, applying AEDPA, has stated that: "The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due

process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302–03 (1973); *Thomas v. Hubbard*, 273 F.3d 1164, 1179–80 (9th Cir. 2002) (applying cumulative error doctrine to habeas petition under AEDPA), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002)).  This Court is bound by Ninth Circuit authority, and therefore rejects Respondent's contention there is no clearly established federal law on this issue within the meaning of AEDPA.

For the purposes of this claim, it does not matter that the Court has not found any of Petitioner's alleged errors to be of federal constitutional magnitude.  *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("Where no single trial error is sufficiently prejudicial to warrant habeas relief, the cumulative effect of multiple errors may still prejudice a defendant.").  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *Id.* (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).  "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." *Frederick*, 78 F.3d at 1381.

Petitioner argues the error in the introduction of his prior convictions, which falsely suggested he had the same intent in those crimes as he did here and which the prosecutor used to bolster the weakness of his case, was further exacerbated by the prosecutor's misuse of his priors to imply he was a mean and evil person, and that his defense was further undermined by improper cross-examination of Dr. Smith to suggest his opinion was not credible, all of which, combined with the instructional error lowering or obfuscating the level of intent the jury was required to find, fatally crippled his defense and unfairly bolstered the prosecution case.  (ECF No. 1 at 37–38.)  "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." *Parle*, 505 F.3d

1    at 928 (quoting *Chambers*, 410 U.S. at 294; *Brecht v. Abrahamson*, 507 U.S. 619, 637

2    (1993)).

3         The only error identified by the state court was the prosecutor's reference to the

4    name of the ten-year-old girl who was in the house Petitioner burglarized in 2002, which

5    it correctly found was *de minimis*.  Petitioner may be correct that his defense was weakened

6    by the introduction of his prior convictions, but he has shown no error in the trial court

7    allowing such relevant evidence to be introduced.  The trial judge originally held that only

8    the fact and nature of the convictions—the 2014 burglary and the residential burglaries in

9    2002 and 2000—would come in unless the defense opened the door.  There was no error

10   in allowing additional details to be introduced after Petitioner testified his prior burglaries

11   were completely different than the instant burglary and misrepresented a burglary

12   conviction as a robbery conviction.  The jury was clearly and repeatedly told that evidence

13   was only admissible on the issue of intent, and Petitioner made the evidence relevant to

14   that issue by inviting a comparison between his intent in the prior burglaries and his intent

15   in the charged burglary.  In any case, inconsistencies in his defense including why, if his

16   intent was to summon help, he told the motel manager he was not the person who tried to

17   break into room 118, denied being that person when Kim Schildmeyer pointed him out,

18   and did not ask the manager to call 911, may have weakened his case more than any of

19   these errors.

20        Petitioner argued to the jury that the inconsistencies in his testimony were explained

21   by his intoxication and argues that the jury might have been more accepting of his defense

22   but for the error in allowing his expert witness to be cross-examined regarding other,

23   unrelated and irrelevant cases.  Although Dr. Smith opined that Petitioner was suffering

24   from methamphetamine-induced psychosis, which causes causes erratic, paranoid, and

25   delusional behavior, his opinion was impeached by the fact that no toxicology screen was

26   done on Petitioner due to his refusal to cooperate and by the testimony of his girlfriend,

27   who said his drug of choice was heroin, not methamphetamine, and that she did not see

28   him taking drugs in the days before the incident.  Further, there was no error in allowing

Dr. Smith to be cross-examined regarding other cases he previously testified in to point out that, unlike this situation, they all involved toxicology results showing the defendant was on drugs or medical histories.  This testimony was relevant to Dr. Smith's opinion that Petitioner's ability to form criminal intent may have been affected by his drug use.  Any cumulative effect of the introduction of evidence of the details of the prior convictions and Dr. Smith's other cases, even if it was error, did not render his defense "far less persuasive" than it would have been otherwise, particularly in light of the repeated reminders to the jury regarding how the evidence should be used; therefore, they did not have a "substantial and injurious effect or influence" on their verdict.  *See Parle*, 505 F.3d at 928.  And, as discussed above in claim three, Petitioner has not supported his claim that the allegedly ambiguous or contradictory instructions on intent misled or confused the jury.

In sum, Petitioner has not shown the combined effect of multiple trial court errors, even assuming such errors occurred, "rendered [his] defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." *See Parle*, 505 at 922.  Relief is denied as to the cumulative error claim because, based on an independent review of the record, Petitioner has not carried his burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

## VI.   Certificate of Appealability

"[T]he only question [in determining whether to grant a Certificate of Appealability] is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. ___, 137 S.Ct. 759, 773 (2017).  The Court finds a Certificate of Appealability is not appropriate as to any claim or procedural issue presented in the Petition.

///

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

Based on the foregoing, the Petition for a Writ of Habeas Corpus (ECF No. 1) is **DENIED** and the Court **DECLINES** to issue a Certificate of Appealability.  The Clerk of Court shall enter judgment accordingly.

Dated:  July 30, 2020

Hon. Janis L. Sammartino
United States District Judge

18-CV-2900 JLS (MSB)